Thank you, Judge Reinhardt, and may it please the Court, my name is Mark Caldwell, I'm representing Ms. De Herrera this morning in the Social Security Disability Appeal. I'll keep track of my own time, but with the Court's permission I would like to reserve two minutes for rebuttal, possibly. There are three separate bases on which this Court could rule in my client's favor. Either the treating nurse practitioner's assessment, which on its face was for less than even sustained sedentary work. The examining psychologist's assessment, which the vocational expert testified established limitations inconsistent with sustained work. Dr. Bencomo. Dr. Bencomo. Or Ms. De Herrera's symptoms testimony, which is also facially inconsistent with even sedentary work because she had to lay down an hour and a half to two hours out of the day. I'll address each of those and, of course, respond to any questions, but I would like to go out of order and talk about the remedy in this case. The remedy in this case should be remand for payment of benefits, not for further administrative proceedings. This Court recently had a case called Vasquez in which the Court said there is a split in authority within the Ninth Circuit on the crediting as true rule. And as you know, the crediting as true rule is if the improperly discredited evidence is credited, and that evidence would lead to a finding of disability, and there are no further issues that must be decided, then the proper remedy is remand for payment of benefits. In Vasquez, the Court contrasted Lester v. Chater with a later case, Conant, which said that the Court has some flexibility in applying the crediting as true rule. And the unfortunate language there was we are not convinced that the crediting as true rule is mandatory in the Ninth Circuit. Well, the problem with that is there is a lack of focus with where the discretion applies. The Court has flexibility. The Court has discretion in answering the three questions that I outlined in the affirmative or in the negative. But once this Court, or any Ninth Circuit court, answers those three questions in the affirmative, the evidence was improperly discredited, the evidence when credited would lead to a finding of disability, and there are no further issues that must be decided, then the rule becomes mandatory. Kennedy, why don't we get on to the see if you can get a reversal before you worry about the dispute? As I said, I'm well aware I was taking that out of order, but these issues came up more recently. We've given too much time, because we don't give a lot of time for these cases, and they are complicated cases. They are complicated. So if we talk about the three issues where I said this Court could rule in my client's favor, the strongest one, of course, is the treating medical source, the nurse practitioner, Mr. Glass. I'm not so sure that's the strongest, but I'm giving you my opinion. Why don't we start with Dr. Vencomo, because that's the simplest. Well, it's the simplest. The reason I say it's the strongest, certainly both of those would lead to a finding of disability. There's no doubt of that. The reason I say it's the strongest is the nurse practitioner, Glass, is the one who has the most hands-on experience with Ms. De Herrera. But certainly, you're absolutely correct. If you go to Dr. Vencomo's assessment, the Commissioner's own vocational expert said those limitations are inconsistent with sustained work. So for purposes of discussion, let's assume I'm wrong about the nurse practitioner. I'm always concerned about how much time you're going to get. You've got three issues. You've got four minutes before. I realize that. The regulations on this say the nurse practitioner isn't given equal weight with physicians, either treating physicians or others. I'm going to disagree. The ruling that I cite in my materials, 063P, says that, in fact, a treating nurse practitioner can be given more weight than the opinion of a physician, given the circumstances of the particular case. Well, doesn't that talk more about that we should use the same general kind of review of the source? I thought it said that we use a similar reviewing thing, but I don't think it over turned the rule that nurse practitioners are inherently worthy of less weight than either a treating physician or an examining physician or a reviewing physician. I certainly agree with that. Not inherently, no. But depending on the facts of a case, the ruling, 063P, does say that a nurse practitioner's assessment can trump that of a physician. Well, you've got somebody like McPhee who's done, you know, a relatively complete examination. So your suggestion is that nurse practitioners' opinion should trump his? Most definitely, on several grounds. One, the nurse practitioner has more experience with the claimant than Dr. McPhee. Two, very important here, Dr. McPhee's assessment was not the basis for the ALJ's decision. In Arizona, we call him Medium McPhee because he says everybody can do medium work. So he said that the claimant had an exertional limitation that was at the medium level, but the judge said like. Well, he gives relatively significant findings, though. I mean, he indicates she can do a 90-degree straight leg raising, she can walk heel toe, she's got no trouble getting on or off. I mean, unless he's lying about the straight leg raising, doesn't that kind of get rid of the neuropathy associated with a herniated disc? Well, did he – I don't believe he reviewed the electromyography results that did show that she had nerve damage. And the nerve damage is the key to this case. You know, there are – The bulge is relatively minor, isn't it? The bulge isn't the problem. The words in the MRI are mild, but it's the nerve damage that's the problem. He also finds that all four quadrants, there's no real muscle weakness. Well, maybe that's what he said, but the treating doctor said the extensor halicus longus muscle was weakened, and that's a sign of a nerve damage in the lumbosacral spine. But doesn't that doctor question that? Dr. McPhee? No. Doesn't her own examining or her doctor question whether that's actually true? No. I don't think so. I don't remember seeing that in a file anywhere. But, again, I have to come back to a basic rule of judicial review of ALJ decisions, and that is that this Court's review is limited to the four corners of the ALJ decision. The ALJ did not, in fact, rely upon the McPhee report. The McPhee report was for medium exertional level. The ALJ found light. Therefore, the McPhee report is irrelevant to this Court's review of the ALJ decision because that's not what the ALJ relied upon. And as I note in an extensive footnote in my brief, this particular ALJ makes the same findings in every single case, virtually word for word, regardless of the individual involved. I'm sorry. The ALJ makes the same finding in every case, or Dr. McPhee? Well, I don't have evidence about Dr. McPhee, but I do have evidence about ALJ Dickinson, and I have a very extensive footnote where I quote case after case after case after case after case where he makes the same residual functional capacity finding in each single one. And even in one day, I had five cases with him, and he asked the same hypothetical question word for word in five separate cases, one right after the other. That strains credulity to believe that all those people had the exact same limitations. I see that I'm at two minutes. May I reserve? Thank you. Well, that's what I was afraid of, that we wouldn't get to Dr. Bencomo, but thank you. Good morning, Your Honors. My name is Theofis Regans. I'm with the Office of General Counsel representing the Commissioner Astrew. I want to take your questions more than anything else, but I would like to make one statement up front. I do believe that the ALJ did rely upon the consultative examiner. The mere fact that he did not conclude that the claimant could retain medium exertional capacity does not preclude reliance. And in fact, he says, I give that opinion persuasive weight. Well, let me quote him properly. It's right here. He says, the undersigned is essentially in agreement with Dr. McPhee's opinions, but finds additional limitations that sets forth below. Which page is that? It's on transcript page 29, page 4 of the decision. And it's the second paragraph, the last sentence. So, in fact, he does rely upon consultative examiners' opinions. Counsel, what do we do with Dr. Bencomo? Dr. Bencomo, the ALJ doesn't reject him. He says he's credible. Finds him persuasive, but is not willing to acquiesce entirely in Dr. Bencomo's assessment. That's true. And the ALJ has, it is his purview, it is his responsibility to review all of the opinions of the physicians and to look at them and compare them with the rest of the record evidence. That's not the reason that he didn't give it controlling weight. He said the reason he didn't give it controlling weight was because it appears he based his opinion, at least in part, on subjective complaints of pain. And there was good reason for questioning the reliability of her reports of pain. And then he said that the allegations about the pain are not credible and his conclusions were based, quote, based in significant part on the information provided by the claimant's husband. I'm not quite sure if I understand your question. So the question is, the reason he didn't accept Dr. Bencomo, didn't give it controlling weight and only gave it persuasive weight, was because he didn't accept her subjective pain. And he said the reason he didn't accept it was based in significant part on the information provided by the husband. That's part of the reason. Well, it's in significant part. Yes. He also said that he does not give that particular portion of the opinion controlling weight because it is based upon the subjective complaints. Right. And the doctor said that the reason for his conclusion or his opinion was because of her pain complaints, which he had already discredited. We're not in disagreement. Okay. He said it was because he didn't accept her subjective pain and the doctor relied on the subjective pain. Right. And he said that in significant part, the reason he reached that conclusion was because of what her husband testified to or his form that he submitted. Now, do you agree that the husband's report showed that her subjective claims were not valid? I think there's room for that interpretation. And there's one, there's one, there's one. Sorry, you think what? I think there's room for that interpretation. And I think that I also the husband's report that he quotes in his in his decision. The reasons he didn't give credibility to her claim is that I found a through age, whatever it is. First, she does. He said he continues to get the daughter ready for school. The husband said he does very little chores around the house, mostly try to get things done for a girl to go to school. Rest of the day, she sits or lies down because of the pain. Next was prepare simple meals. Husband said he prepares. She prepares a meal. Sometimes every third day, she makes easy meals, frozen meals, take out. Then the ALJ said she can. She drives. Husband said she drives but not for long. She only leaves the house two or three times a week. Said she shops. Husband said actually once or twice a week with a motorized chair to move around. Said she sews. Well, I'm not quite sure why the fact that she sews has anything to do with her disability. She watches movies. I don't know what that has to do with it. She spends, attends church, he said, every other week. And she spends time with other people. And the husband said other people came to the house to visit her. Do you see that that's a reason to, that report from her husband is a reason to discredit her claim of pain? Well, let me ask you a question this way, Judge. The way that I understood this ALJ's reasoning was that he was saying that Dr. Bencomo says that this claimant has this degree of stress because she has. The pain. The pain. Right. And he's saying that he doesn't agree. He has rejected her subjective testimony with regard to that amount of pain. I think that in large measure, this discussion about what the husband says has to do with her ability to interact with other people. And that the stress claim, it's a secondary reason to eliminate the stress claim. Because he's talking about her ability to interact with other people. She has friends coming over. She deals with her. That's not what he says. The ALJ doesn't say it has to do with her ability to interact with other people. Well, he says the claimant has a friend who visits daily and sees. That's what the husband said. Right. But where does it, the ALJ, as I read it, rejects her basic claim, which is the pain, because of her husband's testimony. Now, the ALJ rejects her pain for a number of reasons that he listed in the decision. What does he mean when he says that he rejects her claim because primarily, not primarily, substantially because of her husband's testimony? Well, it may have been a poor choice of words. But he has. Well, I know. But that's what we're left with, is his assertion that it's substantially. But we also have his discussion discrediting her pain complaints. I know the page when he says he includes the husband's inconsistent statements, talks about routine and conservative treatment, talks about evidence of an inconsistent or a minimal MRI, talks about how treatment improved her symptoms, as she said to one of her doctors, talks about her statement that she only suffered from occasional flare-ups, talks about the fact that she didn't continue to complain about her pain when she subsequently went to doctors. All of that is a part of the ALJ's credibility claims. When he said she didn't complain, there are six medical reports in which it shows she did complain. In the beginning. But when she goes to a doctor later on, on transcript page 333, the doctor refers to her back pain as a prior historical complaint and says, and implies that she actually said to him that the epidural treatments improved that problem. They improved her sciatica, right? Yes. Yeah. And she had three epidural shots three times. Yes. Is she supposed to continue to take epidural all the time? Well, in my experience and people that I know who have had back problems, they have taken several epidural treatments and then that resolved the problem and they're out walking and running around the lake. And sometimes it doesn't resolve it if you have a real problem. It doesn't. But in this particular case, the record seems to indicate that it did. That's what page 6333 said. The doctor said that it's a past problem. And she's there for other reasons. She's not there complaining about the pain. No, that's true. She did go to the doctors for other reasons, too. She had serious other ailments. She was coughing up blood, which was one of the reasons she went to a doctor. And one of the doctors said that was a sinus problem. Whatever it is, I mean, that's why she went to the doctor, not because of her back that time, because she was coughing up blood. And so she didn't go to that doctor for back problems. Well, she did give a statement to the doctor, didn't she, that she could stand for four hours. She did say that to one of the doctors, and the doctor actually suggested that she go back to work in the capacity in a job where she would only be caused to stand for four hours. And that was in 2003, and where her condition worsened and she couldn't stand for four hours was 2006. She went to the doctor after she had the epidural treatments when she was, you know, to say that she didn't have serious treatments when she had radiofrequency, denervation, epidural injections, nerve-blocking procedures. She had a lot of serious treatments back in 1902 and 1903. I think what the ALJ is saying here, though, is that compared to surgery, major surgery, laminectomy, those kinds of treatments, epidurals and nerve denervation are considered conservative treatment. None of it is easy. If it's a back problem and you have to have somebody work on it, we all know that that's painful and that's a real problem. But compared to major surgery to correct a back problem, those other treatments are considered conservative. Did anyone ever recommend major surgery? No one ever. I don't see it in the record. And that would suggest that the conservative treatment actually was helping her. Well, the, you know, what Dr. Vencomo said. I beg your pardon? What Dr. Vencomo said was it was stress caused by pain, and that's the question really, was she having pain? And, of course, excess pain can be established through subjective testimony. And so the question is, did she have excess pain or not? And as I understand the ALJ's report, although you say there are other factors as well, what he said was he found his testimony persuasive, but it wasn't controlling because, let's see, because his conclusions based, quote, based in significant part on the information provided by the claimant's husband. And I asked you whether you find the information provided by the claimant's husband, that that is a reason where he could base his conclusion in significant part on that information. Because I've got to tell you, I read the information that he provided, and I don't see why you would base your decision in significant part on that information. I understand. I think I understand your problem with it. But the position that I'm taking, and I think that what the ALJ did was, even though he used the word significant, he did a credibility evaluation. In that credibility evaluation, he says, I do not believe that her pain is as significant as she alleged. He gave nine reasons, eight of which the district court agreed with. And so the credibility was properly rejected based upon the ALJ's reasoning. He then said that because her credibility is not believable with regard to the extent of pain, I don't believe that this particular limitation is appropriate because it's based on her pain claim. And in addition to that, I place significant weight on her husband's testimony, who actually suggests that the pain is not as bad as it's supposed to be and that her stress level is not as bad as she alleges it is, as Dr. Bencomo says that it is. My time is way over. I'm sorry. Not your fault. Anything else? We could probably talk to you a lot longer, but thank you. All right. Thank you very much. You can keep me up here as long as you want. We were talking about Dr. McPhee, and I guess as I was sitting back there having time to think about it, I sort of said to myself, so what? We have Dr. Bencomo. And when you talk about subjective complaints of a claimant, I don't know what else a mental health evaluator is supposed to rely upon. You can't take a mental impairment and throw it up on a screen like you can an X-ray and look at it. Of course, my clients never complain. They just report symptoms. Well, the problem with Dr. Bencomo is he is relying on her complaints of subjective pain, and if her complaints of subjective pain are not credible, then Dr. Bencomo's diagnosis isn't worth anything. So you get back to the question of whether her complaints of subjective pain are credible. You mentioned something when you were talking to Mr. Reagan, and that was the epidural steroid injections. Now, the judge, the ALJ, says this is like, what did he say, routine conservative treatment? Well, taking a needle and sticking it into somebody's spinal cord and injecting corticosteroids into the spinal cord is only conservative treatment, in my opinion, if it happens to somebody else. Certainly, if that were going to happen to me, I would consider that a major event. And anybody who subjects themselves to that is certainly someone who is credible in terms of the level of pain that they are talking about. Well, I don't know. Maybe you can help, and I suppose there's no way to get evidence. But she did have this epidural treatment three times in about 2003, and it helped her in some respect. Epidural treatment is the kind of things you undergo regularly on a continuing basis? No. As a matter of fact, that's why it's three. You're limited to three in a year, because you can't intrude. It's ill-advised to inject more than that in terms of corticosteroids into the system. Corticosteroids are very powerful things. It's along the line of prednisone, and sometimes the cure is worse than the disease. So you have to be very careful there. I do see my time is up. We'll keep going. Okay. Thank you. The one thing I would also like to talk about is when you talked about how she reported improvement after these treatments, it always strikes me as odd to say that a claimant isn't credible when they report improvement. They're telling the truth. And in Reddick v. Chater, this Court said that reporting improvement is unexpected behavior for someone who would be thought to be exaggerating the limitations from which they suffer. So far from being a report that detracts from Ms. de Herrera's credibility, I submit that it supports her credibility. Unfortunately, in this case the claimant is not. No. It certainly is to her credit that she's reporting to her medical counselors that she's improved with this treatment. And I agree with you that I think the epidural is evidence of serious treatment. Where it comes into question is when in report after report after report from her medical examiners that they placed certain kinds of residual limitations on her, and she gets in before the ALJ and goes to a level that nobody has come close to. She says, I can only stand for half an hour, and then I've got to sit down, and I can only sit for half an hour at a time. And that seems to be inconsistent with everybody who's examined her and filed a report. It's at that point that we begin to wonder whether she's exaggerating her pain. If those events were contemporaneous, I would agree. But as Jen Dreithardt pointed out, when she reported improvement, that was shortly after the course of the – it was either the epidural steroid injections or the nerve denervation. I honestly don't remember which one, but a major medical procedure in either event. And she did have improvement at that time. That was in July of 2003. The hearing was in 2006. You're not talking about inconsistent reports when you talk about somebody who truthfully reports improvement shortly after a major intervention that doesn't last. So you can't contrast validly, in my opinion, a report in 2003 with what she said in 2006. All that means is it didn't take. But her testimony at the hearing seems to be inconsistent with all the medical reports. Now, it may be that she's degenerated at that point, but the problem is it's still inconsistent. Her claim that she can only stand for half an hour or only sit for half an hour at a time is not supported by any of the medical folks that she saw. I disagree. Nurse practitioner Glass imposed limitations very similar to that. Exactly the same, no, but certainly less than sustained sedentary work. Was there anyone who was treating her back other than Glass? No. I mean, she went to various other practitioners for these interventions, but those were referred by Dr. Glass. After 2003, in the period from 2003 to 2006, I think she saw some doctors for other conditions. Oh, certainly. But did anyone treat her for her back condition other than Dr. Glass? Other than referrals from Dr. Glass, no. Nurse practitioner Glass has been the treating source for the vast majority of time that we're talking about. Not the referrals? Were the referrals for the back? Sure. I mean, that's where the nurse practitioner Glass, Center for the MRI, Center for the EMG, referred her for procedures. When were those? When were those referrals? You're going to have to give me a moment on that one. The EMG was ‑‑ I'm sorry, I'm just not seeing a date on that one. The denervation was in May of 2003. That's at ER 202. The MRI was in December of 2002. That's where it talks about the central disc protrusion. Various other ones. That was my impression that the only treatments of that serious nature were in 2002, 2003. I think 2003 was when the greatest level of intervention occurred. After that, there are no medical reports other than Dr. Glass or Mr. Glass. I don't know what you call him. Nurse Glass. Nurse practitioner Glass. Okay. His would be the only medical reports about her back. I agree with that. What's the education level? Is that just an RN or how much additional training on orthopedic issues does a nurse practitioner have? I can only answer somewhat generally. A nurse practitioner is a notch above a registered nurse. I can only tell you I know that the training is more. I can't be more specific in terms of exactly what it is. Is he specialized in orthopedic issues or is he certified in orthopedic issues? No. He's a general practitioner. But he is the one who has the most treatment with the claimant. And this Court has ‑‑ How frequently is he seen?  Is it once a week, once a month, every six months? You'll have to let me look. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 citations to the record. This appears at page 8 of my brief. Help me again. So he sees her 11 times over what time period? He at least saw her since 03. And let me go back. He's the one who ordered the MRI, so that was in December of 02. What I'm really asking is, is he seeing her every week, every month, every five months, every five, you know, year? I just can't answer that question with accuracy standing right here. It's not every week. It's not ‑‑ You'd estimate around 11 times in three years or so. I think that's probably a fair estimate. But, you know, you have to ask yourself what would be the basis for seeing someone more frequently. If they have an intractable problem, you've thrown everything you can at them that would deal with that. Pretty much at that point in time, you're resigned to medication maintenance. Is Glass part of a family clinic? Where is he working? He practiced with Curtis Miller, M.D. And so Dr. Miller is supervising him? Dr. Miller supervises him. And more than that Do we have any evidence that Dr. Miller ever examined your client? Ms. De Herrera testified at the hearing that every time she saw nurse practitioner Glass, she saw Dr. Miller contemporaneously. Okay. But Dr. Miller never filled out any paperwork or testified or anything else? No assessments from Dr. Miller. Okay. So the licensed nurse practitioner is something a little less than a ‑‑ more than a registered nurse, something less than, let's say, a physician's assistant? No. I would put a nurse practitioner on the same level as a physician's assistant, but less than a physician. And the ruling that I was referring to earlier, Ruling 063P, talks about nurse practitioners and physician's assistants in the same sentence. So obviously, that is what I think is the strongest evidence from the point of view of a treating source. But then, as Judge Reinhart pointed out, Dr. Bencomo's assessment would be an independent finding as well, along with the vocational experts' testimony and contradicted testimony, that those limitations are inconsistent with sustained work. Is there anything else I can answer? No. Thank you. Thank you. The case is argued will be submitted.
judges: Gwin, Reinhardt, Bybee